**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FEDEX TRADE NETWORKS TRANSPORT & BROKERAGE, INC., *Plaintiff*, <br><br> v. <br><br> AIRBOSS DEFENSE GROUP, LLC, *Defendant*, <br><br> v. <br><br> MCWILLIAMS COLLECTIVE, LLC, *Third-Party Defendant*. | No. 1:22-cv-1313-LKG (LEAD) |
| AIRBOSS DEFENSE GROUP, LLC, *Plaintiff*, <br><br> v. <br><br> MCWILLIAMS COLLECTIVE, LLC, *Defendant*. | No. 1:23-cv-1253-LKG (CON) |
| FEDEX TRADE NETWORKS TRANSPORT & BROKERAGE, INC., *Plaintiff*, <br><br> v. <br><br> AIRBOSS DEFENSE GROUP, LLC, *Defendant*, <br><br> v. <br><br> MEDITERRANEAN SHIPPING COMPANY S.A., *Third-Party Defendant*. | No. 1:23-cv-02232-LKG |

**AIRBOSS DEFENSE GROUP, LLC'S MEMORANDUM IN SUPPORT OF
MOTION TO STAY LITIGATION PENDING RESOLUTION OF
FEDERAL MARITIME COMMISSION PROCEEDINGS**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................ 1

Background .............................................................................................................. 2

    A.   Factual background ..................................................................................... 2

    B.   Procedural background ................................................................................ 4

Argument:  The Court should enter a stay pending  resolution of FMC proceedings. ................... 6

    A.   The primary-jurisdiction doctrine compels the requested stay. ................... 6

        1.   The FMC has substantial expertise in assessing the reasonableness of the parties' practices and the duty to pay shipping-related charges. ..................... 7

        2.   Resolving issues of reasonable behavior and shipping charges are within the FMC's discretion. .................................................................. 11

        3.   Staying these actions would encourage uniform and consistent rulings. .................................................................................................. 12

        4.   ADG has made a prior application to the FMC. ................................... 14

    B.   The traditional stay factors likewise favor a stay. ....................................... 15

Conclusion ............................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Access Telecommc'ns v. Sw. Bell Tel. Co.*,
    137 F.3d 605 (8th Cir. 1998) .............................................................................14

*AirBoss Defense Group, LLC v. FedEx Trade Networks Transport &*
    *Brokerage, Inc. et al.*,
    Docket No. 24-14 (FMC served Mar. 20, 2024) ...................................................1

*AT&T Corp. v. Nudell*,
    2008 WL 2986776 (D. Md. July 30, 2008) ..........................................................14

*Boger v. Citrix Sys., Inc.*,
    2020 WL 1939702 (D. Md. Apr. 22, 2020) .....................................................14, 15

*Broadvox-CLEC, LLC v. AT&T Corp.*,
    98 F. Supp. 3d 839 (D. Md. 2015) .....................................................................10

*D.L. Piazza Co. v. W. Coast Line*,
    210 F.2d 947 (2d Cir. 1954) ...............................................................................13

*Davis v. Biomet Orthopedics, LLC*,
    2013 WL 682906 (D. Md. Feb. 22, 2013) ...........................................................15

*Ellis v. Tribune Television Co.*,
    443 F.3d 71 (2d Cir. 2006) .................................................................................14

*Envtl. Tech. Council v. Sierra Club*,
    98 F.3d 774 (4th Cir. 1996) ..................................................................................6

*Eric B. Fromer Chiropractic, Inc. v. Inovalon Holdings, Inc.*,
    329 F. Supp. 3d 146 (D. Md. 2018) ............................................................6, 7, 13

*Far E. Conf. v. United States*,
    342 U.S. 570 (1952) .....................................................................................7, 9, 11

*I.C.C. v. Atl. Coast Line R. Co.*,
    383 U.S. 576 (1966) ...........................................................................................12

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ...........................................................................................15

*Maryland Port Admin. v. SS Am. Legend*,
    453 F. Supp. 584 (D. Md. 1978) ...................................................................10, 11

*Mediterranean Shipping Co. USA Inc. v. AA Cargo Inc.*,
    46 F. Supp. 3d 294 (S.D.N.Y. 2014) ..................................................................11

*Mississippi Power & Light Co. v. United Gas Pipeline Co.*,
    532 F.2d 412 (5th Cir. 1976) ........................................................................7, 14

*Nat'l Comm. Assoc., Inc. v. AT&T*,
    46 F.3d 220 (2d Cir. 1995) .................................................................................14

*P.R. Tel. Co., Inc. v. WorldNet Telecomm., Inc.*,
    52 F. Supp. 370 (D.P.R. 2014) .............................................................................7

**Cases—continued**

*Pharm. Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003) ..................................................................13

*Reiter v. Cooper*,
    507 U.S. 258 (1993) ....................................................................6

*Transrisk Corp., Inc. v. Goodyear Tire & Rubber*,
    839 F. Supp. 1162 (D. Md. 1992) ..............................................13

*U.S. Navigation Co., Inc. v. Cunard S.S. Co. Ltd.*,
    284 U.S. 474 .............................................................................9

*United States v. Henderson*,
    416 F.3d 686 (8th Cir. 2005) ....................................................14

*United States v. W. Pac. R. Co.*,
    352 U.S. 59 (1956) ................................................................7, 11

**Statutes**

46 U.S.C.
    § 40101 *et seq.* ........................................................................8
    § 40114(a)(11) ...........................................................................8
    § 41035(b) .................................................................................9
    § 41102(c) .........................................................................5, 8, 12
    § 41104(a)(2)(A) ........................................................................8
    § 41104(a)(14) ...........................................................................8
    § 41104(a)(15) ...........................................................................8
    § 41104(d) .................................................................................5
    § 41104(f) ..................................................................................5
    § 41107(a) ..................................................................................9
    § 41109(a) ..................................................................................9
    § 41301(a) ..................................................................................9
    § 46101 ......................................................................................8

**Other Authorities**

89 Fed. Reg. 20,654 (Mar. 25, 2024) ...................................5, 16

Federal Martime Commission, *Our History* (as of May 17, 2024) ..............8

## INTRODUCTION

During the height of the Covid-19 pandemic, AirBoss Defense Group, LLC (ADG) agreed to supply nitrile rubber gloves to the United States Department of Health and Human Services (HHS) to support the agency's then-raging war against an unprecedented global pandemic. ADG retained a transportation intermediary McWilliams Collective, LLC—which was endorsed by FedEx Trade Networks Transport & Brokerage, Inc. (but was unregistered it turns out)—and ADG paid a fixed per-box price for all the transportation arrangements and shipping-related charges to be handled.

Despite the fixed per-box price it contracted for, ADG ultimately received demands to pay exorbitant freight rates and charges assessed by Federal Maritime Commission–regulated ocean carriers and terminals—including excessive ocean freight, insurance, demurrage, detention, chassis charges, storage, per diem, and a host of other unsupported, punitive, inscrutable charges that were calculated and invoiced improperly.

These unreasonable charges and practices have spawned at least five federal actions and a Federal Maritime Commission proceeding involving the ocean carriers, intermediaries, and terminal operators. ADG tried to mitigate as companies with which it had no relationship came out of the woodwork demanding ever-increasing sums for unsupported charges. ADG endeavored to globally and finally settle all carrier and intermediary issues by paying more than $11 million so it could export or destroy the gloves to stop the continued accrual of charges. But the carriers, intermediaries, and terminals prevented and delayed those efforts for many more months, continuing to accrue charges for themselves.

ADG has commenced a proceeding before the FMC that will adjudicate the lawfulness of these disputed freight and rate charges under the Shipping Act and may absolve ADG from liability for any of these unlawful charges. *See* Exhibit 1, *AirBoss Defense Group, LLC v. FedEx Trade*

1

*Networks Transport & Brokerage, Inc., Mediterranean Shipping Company S.A. & Total Terminals International, LLC*, Docket No. 24-14 (FMC served Mar. 20, 2024) (FMC Compl.). ADG therefore moves the Court to stay the cases before it pending resolution of the FMC proceedings. These actions present precisely the circumstances under which the primary-jurisdiction counsels courts to defer to an agency's expertise. As the federal agency charged with regulating shipping practices and protecting the public from unscrupulous practices, the FMC should have the first say in the reasonableness and lawfulness of the business practices that have precipitated these protracted disputes over freight, demurrage, detention, per diem, chassis, and other charges.

## BACKGROUND

Before the Court are four cases arising out of the ocean shipment of nitrile examination gloves. *See FedEx Trade Networks Transport & Brokerage, Inc. v. AirBoss Defense Group, LLC v. McWilliams Collective, LLC*, No. 22-cv-1313 (D. Md.); *AirBoss Defense Group, LLC v. McWilliams Collective, LLC and Eric McWilliams*, No. 23-cv-1253 (D. Md); *FedEx Trade Networks Transport & Brokerage, Inc. v. AirBoss Defense Group LLC v. Mediterranean Shipping Company, S.A.*, No. 23-cv-2232 (D. Md.); and *A.M. Cross Trade Logistics Network, Inc. et al v. McWilliams Collective, LLC et al.*, No. 24-cv-1021 (D. Md).

### A.     Factual background

The events precipitating these cases began in March 2021, when ADG contracted with the U.S. Department of Health and Human Services to supply the agency with nitrile rubber gloves. FMC Compl. ¶ 10.[1] To fulfill this contract, ADG purchased gloves from a Thailand-based seller. *Id.* ¶ 11. ADG contracted with McWilliams Collective, LLC (McWilliams) to serve as its transportation intermediary, agreeing to pay a fixed per-box price for McWilliams to arrange all

---

[1]     ADG generally draws these facts from its verified FMC Complaint (attached hereto as Exhibit 1), which provides the most complete singular account of these events.

transportation and pay all charges. *Id.* ¶ 12. McWilliams then contracted with FedEx Trade Networks Transport & Brokerage, Inc. (FTN) to transport more than 500 containers of gloves to the United States. *Id.*; *see also* FTN Compl. ¶ 6, Case No. 22-cv-1313. FTN, in turn, contracted with Mediterranean Shipping Company S.A. (MSC), a vessel operating common carrier, to perform the ocean transportation. *Id.* And MSC then contracted with the only non-party to these federal court cases, Total Terminals Inc., to serve as MSC's marine terminal operator. FMC Compl. ¶ 6.

On November 4, 2021, CBP issued a WRO against the manufacturer of the gloves—thus preventing delivery of 202 shipping containers of gloves. FMC Compl. ¶ 13. As entities involved in the shipping process, FTN, MSC, and TTI had immediate notice of the WRO. *Id.* ¶ 14. Despite CBP's order, FTN, MSC, and TTI failed to extend the free time and continued to assess demurrage, detention, chassis charges and per diem as to the 202 containers detained by CBP. *Id.*

FTN then transported certain containers to Price Transfer, Inc., a CBP-approved centralized examination station, at CBP's direction. FMC Compl. ¶ 16. FTN hired a motor carrier, ITS Logistics, to transport the containers; two were misdelivered and five more were held by an ITS subcontractor. *Id.* ¶ 17.

Despite ADG's contract with and payment to McWilliams to cover all ocean freight and related charges to HHS's warehouse, in late March 2022, FTN informed ADG that McWilliams had failed to pay FTN's invoices. FMC Compl. ¶ 18. FTN then filed two CBP Form 3485 lien notices for more than $14,000,000: a general lien against 129 of the 202 WRO containers for $4,287,540.10 in freight charges and $5,586,880 in per diem charges; and a general lien against 66 of the 202 WRO containers housed at TTI for $2,289,817.38 in freight and $3,231,745 in detention and demurrage charges. *Id.* ¶ 18. ADG learned about FTN's liens when ADG tried to export the gloves to stop the accrual of charges but could not do so because of the liens. *Id.* ¶ 19.

3

In the meanwhile, ADG retained McWilliams in early 2022 to serve as transportation intermediary for a shipment of replacement gloves. McWilliams retained a freight forwarder A.M. Cross Trade Logistics Network Inc., which along with its affiliate Jemara International Freight Services Inc., filed the action that is now Case No. 24-cv-1021. These plaintiffs similarly allege that McWilliams did not pay assorted costs for freight and transportation services and that ADG is somehow responsible for them. *See generally* Complaint, Case No. 24-cv-1021.

### B.    Procedural background

The first of the four cases before this Court began when FTN sued ADG for alleged nonpayment of freight, demurrage, and other charges for 578 containers, including the 202 WRO containers, totaling more than $26 million. *See* Case No. 22-cv-1313. And ADG then had to implead McWilliams who was responsible for these charges. *See* Case No. 22-cv-1313.

Despite FTN's failure to invoice ADG and withholding information necessary for ADG to evaluate the disputed charges, ADG settled with FTN for $5 million and potential additional amounts up to $6 million. FMC Compl. ¶ 23. In exchange, FTN agreed to dismiss the action with prejudice and promised to arrange a meeting with MSC—the only entity ADG understood to have outstanding charges that were not settled in the ADG-FTN settlement. *Id.* ¶¶ 23-24. ADG and MSC then negotiated a settlement of all remaining charges. *Id.* ¶ 24. During the settlement process, FTN provided a spreadsheet suggesting there were additional chassis charges from a company called ITS. *Id.* ¶ 25. ADG inquired about the chassis charges with MSC, which expressly represented that its chassis charges were for all implicated containers. *Id.* ¶ 24. In reliance on that representation, ADG and MSC settled the remaining charges for $5.75 million. *Id.* ¶ 27.

ADG then arranged export of the containers to avoid additional charges. But MSC unilaterally changed the scheduled export bookings. FMC Compl. ¶ 29. Because FTN and ITS continued to insist that ADG owed more chassis charges—despite MSC's representations to the contrary—

ADG repeatedly requested that MSC, FTN, and ITS resolve the disputed ITS chassis charges. *Id.* ¶ 30. Instead, FTN sued ADG again. *See* Case No. 23-cv-2232. FTN now demands ADG pay the ITS chassis charges that ADG settled with MSC. Case No. 23-cv-2232, ECF 1. ADG, in turn, had to implead MSC to indemnify ADG for those charges. Case No. 23-cv-2232.

ADG thought that its settlements had ended disputes over these charges. Realizing they had not and that the list of unknown intermediaries and charges was only continuing to grow, ADG filed a complaint with the FMC on March 20, 2024. ADG alleges that FTN, MSC, and a terminal operator (TTI) violated the Shipping Act by failing "to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." 46 U.S.C. § 41102(c). In particular, ADG alleges that the parties failed to observe just and reasonable practices because

- FTN demanded payment of inaccurate, inconsistent, and unsupported demurrage, detention, per diem, and chassis charges (FMC Compl. ¶ 37);

- FTN, MSC, and TTI assessed detention charges that do not promote freight fluidity (*id.* ¶ 38);

- FTN, MSC, and TTI failed to extend free time or to waive or reduce detention charges for containers that the designated termination location refused to accept (*id.* ¶ 39); and

- FTN, MSC, and TTI failed to invoice ADG for the all the charges (*id.* ¶ 40).

ADG seeks an order that it has no duty to pay any of these charges to FTN, MSC, and TTI under 46 U.S.C. § 41104(d) and 46 U.S.C. § 41104(f) due to the parties' unreasonable behavior and practices and that ADG is entitled to reparations for all damages flowing from this unlawful conduct. FMC Compl. § X.

In the FMC proceeding, answers are due on May 31, 2024, after which discovery will be

completed within 150 days. *See* Initial Order & Order on Motion to Extend, FMC Docket No. 24-14, Doc Nos. 4, 15 (available at https://www2.fmc.gov/readingroom/proceeding/24-14/). The ALJ's initial decision will then be issued by March 20, 2025, with a final Commission decision issued by October 6, 2025. *See* 89 Fed. Reg. 20,654, 20,655 (Mar. 25, 2024).

ADG now moves to stay these federal court actions while the Commission expeditiously resolves the legality of the various charges implicated in these cases, a matter uniquely within its expertise.

**ARGUMENT:**
**THE COURT SHOULD ENTER A STAY PENDING**
**RESOLUTION OF FMC PROCEEDINGS.**

The Court should enter a stay of these actions pending resolution of the FMC proceedings. The primary jurisdiction doctrine—which authorizes courts to stay litigation while parties seek an administrative ruling on matters within the agency's expertise—squarely applies in these cases. The FMC will consider and issue an initial ALJ decision by March 2025 resolving the legality under the Shipping Act of the business practices and assorted charges that resulted in these actions with a final decision following in October 2025. The FMC should have the chance to adjudicate these issues, which the Court can then apply to resolve any lingering contractual disputes before it. Proper allocation of responsibility between the courts and a federal agency, as well as judicial and party economy and efficiency, all support a brief stay while the FMC proceedings resolve.

**A.    The primary-jurisdiction doctrine compels the requested stay.**

The primary jurisdiction doctrine enables courts to "stay[] further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling" where "claims properly cognizable in court … contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). "[T]he doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of

fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Eric B. Fromer Chiropractic, Inc. v. Inovalon Holdings, Inc.*, 329 F. Supp. 3d 146, 154 (D. Md. 2018) (quoting *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996)).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956). But courts typically consider: "(1) whether the question at issue is within the conventional experience of judges or it is within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Eric B. Fromer Chiropractic, Inc.*, 329 F. Supp. 3d at 155.

The actions before the Court are prime candidates for staying litigation under the primary-jurisdiction doctrine. These cases involve a myriad of claims between and among several parties precipitated by the unreasonable charging behaviors that FTN and MSC employed. Staying litigation will allow the FMC, with its expertise in maritime storage and transportation charges, to resolve these questions in the first instance—thus ensuring uniformity and overall efficiency as between the FMC and this Court.

### 1. The FMC has substantial expertise in assessing the reasonableness of the parties' practices and the duty to pay shipping-related charges.

The first factor—expertise—favors a stay: a central and dispositive issue in these actions— whether the assorted charges are lawful under the Shipping Act—is squarely within the FMC's field of expertise.

"Application of the primary jurisdiction doctrine is most appropriate when the matter to be decided is at the heart of the agency's competency or concerns intricate or technical facts requiring agency expertise." *P.R. Tel. Co., Inc. v. WorldNet Telecomm., Inc.*, 52 F. Supp. 370, 377 (D.P.R.

2014); *see also Far E. Conf. v. United States*, 342 U.S. 570, 574 (1952) ("in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over"); *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 420 (5th Cir. 1976) ("Development of the factual context by those expert in the area, is an established basis for primary jurisdiction").

The FMC is the agency Congress charged with "ensur[ing] a competitive and reliable international ocean transportation supply system that supports the U.S. economy and protects the public from unfair and deceptive practices." FMC, *Our History* (as of May 17, 2024), perma.cc/5M3V-ZZYV; *see also* 46 U.S.C. § 46101 (defining the purposes of the Shipping Act).

The Shipping Act includes numerous substantive standards governing ocean carriers' and intermediaries' business practices (*see generally* 46 U.S.C. § 40101 *et seq.*)—including prohibitions on:

- "fail[ing] to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property" (§ 41102(c));

- "assess[ing] a party for a charge that is inconsistent or does not comply with all applicable provisions and regulations" (§ 41104(a)(14));

- "invoic[ing] any party for demurrage or detention charge unless the invoice includes information as described in subsection (d)" (§ 41104(a)(15));

- "provid[ing] service in the liner trade that is—(A) not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract entered into …" (§ 41104(a)(2)(A)); or

- "knowingly and willfully accept[ing] cargo from or transport cargo for the account of a non-vessel-operating common carrier that does not have a tariff … or an ocean transportation intermediary that does not have a bond, insurance, or other surety as required" (§ 40114(a)(11)).

Violators may be ordered to give a "refund of the charge" plus subject to civil penalties. 46 U.S.C. § 41107(a), 41109(a). Furthermore, Congress expressly authorized the filing of a sworn complaint with the FMC to remedy violations of the Shipping Act. *Id.* § 41301(a). And it empowered the FMC to award "the payment of reparations to the complainant for actual injury caused by a violation of this part." *Id.* § 41035(b).

Central issues in this case fall squarely within the FMC's conventional expertise and would materially aid the efficient resolution of these actions. The lawfulness under the Shipping Act and reasonableness of FTN's and MSC's actions are uniquely suited to the FMC's expertise. Moreover, the FMC is the best-suited body to sort out the dizzying array of factual questions surrounding the charges at issue—whose they are, where they came from, how they were documented, and whether they were reasonable. Similar actions have been stayed pending FMC proceedings where issues of technical maritime policies or knowledge arise. *See Far E. Conf.*, 342 U.S. at 572-573 (conspiracy to restrain foreign trade with respect to a dual-rate system enforced by steamship carriers); *U.S. Navigation Co., Inc. v. Cunard S.S. Co. Ltd.*, 284 U.S. 474, 479 (conspiracy to restrain foreign trade by providing a lower tariff rate to shippers who used the respondent's shipping lines).

Allowing the FMC in the first instance to assess whether FTN and MSC fulfilled their Shipping Act obligations in the receiving, handling, storing, and delivering of the containers—and thus whether any of these charges are lawful—would materially aid the Court in efficient resolution of these matters. Without staying litigation, this Court would need to manage discovery into

and opine on these complex Shipping Act issues—like whether FTN, a non-vessel operating common carrier, provided accurate container locations, equipment return locations, and reasonable regulations relating to the assessment of demurrage and detention—at the same time the FMC is doing the very same thing. While these are issues outside of the Court's expertise, they are matters the FMC regularly considers and, indeed, was empowered by Congress to resolve.

Similarly, the FMC has the knowledge and expertise to decide whether FTN, MSC, and TTI can legally refuse to extend the time for ADG to destroy the WRO containers without additional shipping charges; whether FTN, MSC, and TTI needed to invoice ADG for assessed charges; and whether FTN can fail to provide accurate information concerning the WRO containers that would have expedited the destruction of the gloves. The Court's common experience does not include such questions—in fact, the Court would likely need an expert to opine on such issues. Here, the FMC is a Congressionally designated expert. *See Maryland Port Admin. v. SS Am. Legend*, 453 F. Supp. 584, 593 (D. Md. 1978) ("[T]his Court is satisfied that the FMC should have the first opportunity of determining the validity, reasonableness and construction of the three tariff provisions"—which set the rates, terms and conditions that the plaintiff provides as a terminal operator—as "[a]n administrative determination of the possible interrelationship between the provisions of the tariff and the rates charged for terminal services would be of considerable assistance to the Court in finally deciding the questions raised here.").

Indeed, many of the Shipping Act issues raise reasonableness questions: whether FTN, MSC, and TTI's actions were reasonable in light of their obligations as maritime entities and in light of the circumstances. Courts often stay litigation for agencies to consider questions of reasonableness. *See Broadvox-CLEC, LLC v. AT&T Corp.*, 98 F. Supp. 3d 839, 843-44 (D. Md. 2015) (remarking that courts refer issues concerning the reasonableness of a carrier's tariff to the FCC

but not actions seeking enforcement). As the entity charged with regulating this industry, the FMC regularly considers the reasonableness of ocean shipping charging practices.

While these cases do include contract-based claims, which are no doubt within the Court's expertise, in light of the Shipping Act overlay on MSC's and FTN's behavior, these cases are far more complicated than simple matters of contract enforcement. *See* ADG Answer p. 6, Case No. 23-cv-02232 (asserting affirmative defenses based on illegality under the Shipping Act). These cases involve substantial questions regarding whether FTN's and MSC's behavior throughout this entire series of events was lawful under the Shipping Act. Resolution of that question, which is uniquely within the FMC's expertise, will then enable the Court to decide how to construe and resolve the various contract-based disputes between and amongst the various parties.

### 2. Resolving issues of reasonable behavior and shipping charges are within the FMC's discretion.

The second factor—agency discretion—also favors a stay: appropriate resolution of central issues in these cases falls within the FMC's discretion.

Judicial proceedings should be stayed when a claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *W. Pac. R. Co.* at 63-64. "The doctrine of primary jurisdiction does no more than allocate initial jurisdiction between the administrative agency and the judiciary. It determines not which forum will finally decide an issue but only which forum will first decide an issue." *Maryland Port Admin.*, 453 F. Supp. at 592. Staying litigation pending resolution from the FMC faithfully adheres to Congress's allocation to the FMC of the obligation to determine the reasonableness of shipping practices and its discretion to prescribe remedies.

The issues stemming from FTN's and MCS's behavior in the wake of the WRO and the handling of ADG's shipments requires "the exercise of administrative discretion." *Far E. Conf.*,

342 U.S. at 574. The FMC is regularly tasked with interpreting issues concerning demurrage, chassis, and per diem charges, as these issues commonly arise in Shipping Act violations. Indeed, an MSC subsidiary has previously argued successfully that "alleged violations of the Shipping Act must be addressed with the Federal Maritime Commission" because of its "exclusive primary jurisdiction." *Mediterranean Shipping Co. USA Inc. v. AA Cargo Inc.*, 46 F. Supp. 3d 294, 301 (S.D.N.Y. 2014) (granting MSC summary judgment as to defendant's counterclaim of refusal to negotiate under the Shipping Act because this alleged violation must be addressed with the FMC). Thus, issues related to the parties' failures to "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property" fall within the FMC's discretion. 46 U.S.C. § 41102(c).

This is especially apt because of the nature of Shipping Act violations—which often turn on reasonableness assessment of a party's business practices. These issues necessarily involve some measure of discretion in application, and the FMC is the agency that Congress designated to resolve such matters.

These cases implicate far more than simple contract disputes. Instead, they will involve highly technical, factually complex questions for which the ultimate outcome turns on substantial FMC discretion as to appropriate maritime practice and policy. Staying litigation while the FMC proceeding resolves ensures proper deference to the FMC's administrative discretion in enforcing and remedying violations of the Shipping Act. The answers to those questions logically precede any ability by this Court to finally adjudicate the various contract-based claims among and between the parties.

### 3.    *Staying these actions would encourage uniform and consistent rulings.*

Staying litigation pending resolution of the FMC proceeding would promote uniformity and consistent rulings. The very point of the primary jurisdiction doctrine is to ensure uniformity:

as the Supreme Court explained in cases of shipping rates, "[i]f shippers could challenge the filed rates by proceedings before a court, without prior resort to the Commission, different conclusions might be reached by different courts; and the prevailing shippers would thereby obtain a rate preference as compared to unsuccessful shippers, which would violate the principle of uniform rates." *I.C.C. v. Atl. Coast Line R. Co.*, 383 U.S. 576, 591-592 (1966). The same logic follows here. Both these actions and the FMC proceeding involve the reasonableness of additional shipping, demurrage, detention, chassis, per diem, and other charges and FTN's and MSC's approach to ADG. To finally resolve the various parties' liability to any other party, the Court will necessarily need to evaluate whether each party upheld its end of the agreement and can lawfully enforce any obligations for these charges.

Because the FMC "has exclusive primary jurisdiction over" matters "under the Shipping Act" (*D.L. Piazza Co. v. W. Coast Line*, 210 F.2d 947, 948 (2d Cir. 1954)), referring these issues to the FMC would ensure uniformity. A ruling by this Court on the performance of duties and the shipping charges assessed to ADG could have long-lasting implications. If there is not uniformity between these matters and FMC proceedings, future litigants could see contrary precedent on what constitutes permissible behavior, which could lead to further disparate rulings. *See Transrisk Corp., Inc. v. Goodyear Tire & Rubber*, 839 F. Supp. 1162, 1168 (D. Md. 1992) (staying litigation to allow the Interstate Commerce Commission to define the terms central to "contract carriage" as otherwise "different and inconsistent legal conclusions will [be] derived by different courts reviewing essentially the same contracts").

Overall, the "doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003)

13

(Breyer, J., concurring). Like future litigants, not staying litigation could prejudice the parties. If the Court's and FMC's decisions diverge, the parties will be forced to navigate this inconsistency. *See Eric B. Fromer Chiropractic, Inc.*, 329 F. Supp. 3d at 155 (granting motion to stay litigation because defendants had petitioned the FCC to determine whether the fax at issue was a prohibited advertisement, so a ruling by the court could lead to inconsistent interpretation with the agency's forthcoming determination). Given the importance of safeguarding uniformity among decisions in this regulated industry, staying litigation would ensure this Court does not resolve issues in ways that run contrary to the FMC's final order.

### 4.    *ADG has made a prior application to the FMC.*

Finally, "[c]ourts should be especially solicitous in deferring to agencies that are simulta-neously contemplating the same issues." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 87 (2d Cir. 2006). When considering motions to stay litigation, courts look to "whether a prior application to the agency has been made." *Nat'l Comm. Assoc., Inc. v. AT&T*, 46 F.3d 220, 222 (2d Cir. 1995).

ADG filed an FMC Complaint based on the same fact pattern implicated in these cases. The FMC has committed to issuing an initial decision by March 20, 2025, and a final decision by October 6, 2025. Thus, the FMC will decide many of the same issues in front of this Court regard-less of whether litigation is stayed. *Mississippi Power & Light Co.*, 532 F.2d at 420 ("The advisa-bility of invoking primary jurisdiction is greatest when the issue is already before the agency."). Staying litigation "in deference to a parallel administrative agency proceeding" (*AT&T Corp. v. Nudell*, 2008 WL 2986776, at *7 (D. Md. July 30, 2008) (quoting *United States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005))) would effectively "coordinate judicial and administrative decision making" (*Access Telecommc'ns v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998)).

Nor would the non-moving parties be prejudiced by the stay of this litigation. *See Boger v. Citrix Sys., Inc.*, 2020 WL 1939702, at *1 (D. Md. Apr. 22, 2020). FTN and MSC will be required

14

to participate in the FMC proceeding regardless. The only difference is that deferring to the FMC in the first instance will encourage uniformity and provide the Court with information from an agency with specialized knowledge that will benefit all the parties. At this point, the various payment disputes among the parties have been ongoing for years, with little party progress on who owes who how much and why. There can hardly be a claim of prejudice from a brief stay while the FMC proceeding resolves these central questions about the reasonableness of the charges at issue. Therefore, to ensure consistent interpretations and overall efficiency of the matters before the Court, litigation should be stayed under the primary-jurisdiction doctrine.

      **B.**    **The traditional stay factors likewise favor a stay.**

Beyond the primary jurisdiction doctrine, this Court also has "inherent authority to stay a case so as to best manage its own docket and control the orderly progression of litigation." *Boger*, 2020 WL 1939702, at *1; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Courts traditionally consider three general factors when ruling on a motion to stay: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Boger*, 2020 WL 1939702, at *1 (quoting *Davis v. Biomet Orthopedics, LLC*, 2013 WL 682906 (D. Md. Feb. 22, 2013)). Although subsumed within the primary-jurisdiction analysis, it bears emphasis that these traditional stay factors support the requested stay too.

First, judicial economy strongly supports the requested stay. The FMC is right now considering issues that this Court will also be called on to resolve—ironing out who has charges and in what amounts and the legality of those charges. It makes little sense for this Court to move forward in parallel when the FMC will resolve what is likely to be one of the most hotly contested issues in these cases.

Second, the hardship to ADG if the actions are not stayed is substantial, and the equities

thus favor ADG's stay request. ADG has invested substantial time and effort to trying to sort through the innumerable entities and charges implicated in this action from parties with whom it has no contractual relationship. FMC Compl. ¶¶ 20-31. More of this time-consuming work will be undertaken in the FMC proceeding; ADG should not have to perform these efforts twice in parallel litigation and FMC proceedings when the FMC is *the* federal agency tasked with regulating parties like FTN and MSC. ADG, as a party injured by Shipping Act violations, should be permitted to invoke the expertise of the FMC to sort this out rather than forced to litigate it in multiple fora.

Third, there is no potential prejudice to any non-moving parties. McWilliams Collective, LLC has consented to the requested relief. *See* Case No. 23-cv-223, ECF No. 39. And there cannot be prejudice to FTN and MSC for several reasons. First, the parties will do discovery in the FMC proceeding, so there is no delay in FTN and MSC being able to develop their respective cases. Second, these cases are only about money damages at this point. There is no meaningful prejudice in staying these actions while the FMC proceedings play out when it is only money damages that could possibly be recovered by large companies. Third, the FMC is a federal agency to which FTN and MSC have submitted to regulate them. FTN and MSC cannot be prejudiced by being obligated to have their own regulator decide their obligations under the Shipping Act before they can complete court cases seeking a recovery for unlawful charges. And fourth, the stay is limited in duration. The FMC has committed to issuing an initial ALJ decision in 10 months—by March 2025—with a final decision following in October 2025. Given these commitments, the stay will be for a limited time, curtailing any prejudice.

## CONCLUSION

For the reasons stated above, ADG respectfully requests that the Court grants its motion to stay litigation pending the resolution of the Federal Maritime Commission proceedings—for which the FMC will issue a final order on October 6, 2025. *See* 89 Fed. Reg. at 20,655.

Dated: May 21, 2024                         Respectfully submitted,

/s/ *Sarah P. Hogarth*

Sarah P. Hogarth (No. 30278)
Llewelyn M. Engel (*pro hac vice*)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
shogarth@mwe.com
(202) 756-8000

*Counsel for AirBoss Defense Group, LLC*